UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE HUNTER GROUP, INCORPORATED,
            *Plaintiff-Appellant,*

v.

SUSAN M. SMITH; MARTIN W.
REIMER; RENEE YATES-CREECH;
CATHERINE COOPER; GALE E. MANN;         No. 00-1505
DELOITTE & TOUCHE, LLP,
            *Defendants-Appellees.*

            and

JULIA M. SALTER,
                        *Defendant.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-97-1871-AMD)

Argued: February 26, 2001

Decided: May 24, 2001

Before WILLIAMS and MICHAEL, Circuit Judges, and
Cynthia H. HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Stacie Eileen Tobin, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellant. Stephen M. Sacks, ARNOLD & PORTER, Washington, D.C., for Appellees. **ON BRIEF:** James D. Mathias, PIPER, MARBURY, RUDNICK & WOLFE, L.L.P., Baltimore, Maryland, for Appellant. Ronald A. Schechter, Jonathan R. Streeter, ARNOLD & PORTER, Washington, D.C.; Daniel F. Goldstein, BROWN, GOLDSTEIN & LEVY, Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Hunter Group, Inc. (Hunter), filed suit against Susan Smith, Martin Reimer, Renee Yates, Catherine Cooper, Julia Salter,[1] and Gail Mann (collectively, the employees) in the United States District Court for the District of Maryland, alleging that they breached the nonsolicitation and noncompete clauses in their employment agreements by joining, and enticing each other to join, Deloitte & Touche, L.L.P. (Deloitte). Hunter also sued Deloitte, alleging tortious interference with contract, unfair competition, and civil conspiracy.[2] After a bench trial, the district court ruled in favor of the employees and Deloitte. Hunter argues on appeal that the district court erred in finding that there was no solicitation of its employees; that the district court incorrectly applied Georgia law, rather than Maryland law, to determine that the noncompete provisions are unenforceable; and that the district court erred in concluding that even if the noncompete provisions were

---

[1]Hunter dismissed its claims against Salter prior to trial.

[2]Hunter brought its unfair competition and civil conspiracy claims against both Deloitte and the employees.

enforceable, Hunter was not entitled to recover any damages for the employees' breaches of those provisions. Finding no reversible error, we affirm.

I.

Hunter, which is a Maryland corporation with offices throughout the country, is engaged in the sale of various services and products relating to financial accounting and human resources administration. Smith, Reimer, Yates, Cooper, and Mann are former employees of Hunter who are now employed at Deloitte. Deloitte, which is an international consulting firm, is a competitor of Hunter.

The employees worked in Hunter's Education Services Department in Atlanta, Georgia (the Department). Smith was a supervisor in the Department. Each of the employees was a party to a signed employment agreement with Hunter, and each employment agreement contained a nonsolicitation clause prohibiting the employees from soliciting the employment of any other Hunter employee for twelve months after leaving Hunter. All of the employment agreements, except Salter's, also included a noncompete provision which, among other things, prohibited the employees from working for a competitor for a six month period following the termination of their employment at Hunter.

The relevant nonsolicitation provision, as found in Smith's employment agreement, provided,

> During the period of employment, and for a twelve (12) month period thereafter, EMPLOYEE agrees that he/she will not employ or solicit the employment of any HUNTER employee or any of HUNTER's consultants, subcontractors or independent contractors. Nothing herein shall be construed to prohibit EMPLOYEE from soliciting or employing any HUNTER employee, consultant, subcontractor or independent contractor who was terminated by HUNTER for economic or budgetary reduction purposes.

(J.A. at 33-34.)[3] The relevant noncompete provision provided,

---

[3]The contract does not define "solicit" or "solicitation."

(a) During the term of his/her employment, and for a six (6) month period thereafter, EMPLOYEE agrees that he/she will not render, directly or indirectly, any services of an advisory or consulting nature similar in character to those offered by HUNTER, whether as an employee or otherwise, and whether paid or unpaid, to any business which is a competitor of HUNTER.

. . .

(c) For the purposes of this paragraph 11., the term "competitor" is defined as those persons, firms or corporations which provide consulting, systems implementation, systems integration, or advisory services in the areas of Human Resource Administration or Financial Accounting systems.

(J.A. at 34.)

Smith spent more than a year at Hunter developing training courseware to assist its clients in the use of PeopleSoft software, which is a computer software package that provides financial and human resources applications.[4] On January 20, 1997, Hunter fired Smith because she had "irreconcilable differences" with Mary Weaver, a Hunter senior vice-president. Smith secured counsel in order to determine the scope of her contractual obligations to Hunter. Smith also contacted a headhunter and began interviewing for jobs with other firms. During her job search, Smith discovered that the market for consultants with PeopleSoft experience was "hot" and that Hunter had been substantially underpaying her. Although Smith's last salary at Hunter had been $75,000, other firms offered her salaries ranging between $90,000 and $120,000.

On February 10, 1997, Smith accepted Deloitte's offer of employment, and on March 10, 1997, Smith began work for Deloitte. In her new position, Smith supervised individuals hired to provide PeopleSoft training to Deloitte employees and developed PeopleSoft training

---

[4]PeopleSoft software is owned by PeopleSoft, Inc. PeopleSoft has licensed over forty companies, including Hunter, to use its software and to provide training to end-users of its products.

courseware. That same month, Weaver wrote to Deloitte acknowledging that Smith had been hired and cautioning Deloitte against using any Hunter trade secrets. Weaver's letter did not suggest that Deloitte was acting inappropriately in employing Smith. Weaver later testified at the preliminary injunction hearing that she "did not want to prevent Ms. Smith from getting employment." (J.A. at 583, 1213-14.)

Over the course of the next few months, the other employees in the Department became increasingly dissatisfied with the situation at Hunter. Among other things, the employees were concerned about staffing levels, the lack of leadership, the delay in hiring a replacement for Smith, and the qualities of the person who appeared to be positioned to replace Smith. Several of the employees, both independently and jointly, therefore initiated contact with Smith at various times to ask her about her job search, to request information about firms with which she interviewed, to find out about headhunters or other contacts, and to ask for her help in getting their resumes to Deloitte recruiters. For example, in April 1997, Salter contacted Smith to arrange dinner with her. Without telling Smith, Salter allowed Reimer, Yates, and Julia Howley, another co-worker at Hunter, to join them at dinner. At the dinner, Salter, Yates, and Howley informed Smith that they were interested in positions at Deloitte, and they asked her various questions about opportunities at Deloitte. At the request of Yates and Howley, Smith wrote down "ballpark" salary figures that she had seen during her job search. Yates asked Smith if Smith could forward her resume to an appropriate person at Deloitte, and Smith agreed. The district court explicitly found that Smith did not initiate contact with the employees and that the employees each independently decided to explore the possibility of leaving Hunter before contacting Smith. Eventually, Cooper, Yates, Mann, Reimer, and Salter each left Hunter to go to Deloitte.[5]

On June 10, 1997, Hunter filed suit against Smith, Cooper, Yates, Mann, and Reimer alleging breach of their employment agreements. Hunter also alleged unfair competition and civil conspiracy against the employees and Deloitte and tortious interference with contract

---

[5]Howley ultimately decided not to leave Hunter, although she was given an offer at Deloitte.

against Deloitte.[6] Hunter sought a TRO, preliminary and permanent injunctive relief, and damages. The district court denied injunctive relief and we affirmed. *The Hunter Group, Inc. v. Smith*, No. 97-2218, 1998 WL 682154 (4th Cir. Sept. 23, 1998) (unpublished). On July 19 and 20, 1999, the district court held a two-day bench trial.

The district court found in favor of the employees. With respect to whether Smith breached her nonsolicitation provision, the district court stated that "whatever may be the outer limits of a reasonable interpretation of 'solicit,' those limits are not reached in the case at bar because it is clear that the term does not encompass mere contact between an ex-employee and her former colleagues, and it does not encompass responding to questions and requests regarding her new employer initiated by her former colleagues." (J.A. at 1229.) The district court explicitly credited the accounts of the employees, who testified that they were uncomfortable with the direction that their Department was taking after it fired Smith, that they considered leaving Hunter before they spoke to Smith, and that Smith did not initiate contact with them, but rather that Smith only supplied information to them in response to their questions. The district court also found that the employees, at most, shared information about their own employment plans amongst each other and did not solicit each other.

As to the noncompete provisions, the district court applied Georgia law, rather than Maryland law,[7] because it concluded that Georgia had

---

[6]Hunter originally also alleged that Deloitte and the employees misappropriated Hunter's trade secrets but, after additional discovery, it voluntarily dismissed that claim. It then amended its complaint to add a negligent supervision claim against Deloitte.

[7]The choice-of-law provision in the employment agreement provided that Maryland law should govern. The district court properly looked to Maryland law, which follows § 187 of the Restatement (Second) Conflict of Laws, to determine whether to apply Maryland or Georgia law. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 323 (4th Cir. 2000) ("For its choice-of-law rules, Maryland subscribes to § 187 of the Restatement (Second) of Conflict of Laws."). Under § 187, Maryland courts apply the law of another jurisdiction notwithstanding a choice-of-law provision (1) where Maryland has no substantial relationship to the parties or transaction and there is no other reasonable basis for the parties' choice; or (2)

a far greater relationship to the employment contracts and that the noncompete agreements violated Georgia's fundamental public policies. Specifically, the district court stated that "the Hunter noncompete clause is so broad that it violates Georgia fundamental public policy and Georgia courts would not enforce it. While the Hunter noncompete is of limited duration, it covers an overly broad scope of activity and it contains no geographical restriction." (J.A. at 1226.) Because the district court found no underlying liability for the alleged breaches of the noncompete and nonsolicit provisions, the district court found it unnecessary to reach Hunter's tortious interference, negligent supervision, and civil conspiracy claims. Finally, the district court noted that even if Hunter's noncompete provision was enforceable, Hunter had failed to prove any damages from the employees' alleged breaches of their agreements. The district court stated that

> [e]ven if the noncompete provisions were enforceable, . . . Hunter has failed to establish that it suffered any damages as a result of the five individual defendants going to work for a competitor rather than for some other employer when they left Hunter. Hunter's counsel acknowledged that Hunter was not presenting any damages "based on identifiable or specific lost contracts" to Deloitte. Instead, Hunter's damages calculation is based entirely upon alleged lost revenues caused when four of the individual defendants (not including Smith) and one additional employee (Salter) left Hunter. Based on the record here, Hunter's damages calculation would have been the same had these employees elected to withdraw from the labor market altogether. Thus, Hunter has not proved by a preponderance of the evidence that the alleged violation of the noncompete provision caused it any damage . . . .

(J.A. at 1227 (internal footnote omitted).)

where the other jurisdiction has a materially greater interest in determining the issue, that jurisdiction has the most significant relationship to the transaction absent the contractual choice, and applying Maryland law would violate the fundamental policy of the other jurisdiction. *See id.* at 323-24 (citing Restatement (Second) of Conflict of Laws § 187(2) (1971)).

Hunter raises several issues on appeal. First, Hunter argues that the district court erred in finding that there was no solicitation of its employees. Second, Hunter argues that the district court erred in applying Georgia law rather than Maryland law in evaluating the enforceability of Hunter's noncompete provision and that under either law, the noncompete provision is enforceable. Third, Hunter asserts that the district court erred in failing to consider its tortious interference with contract, negligent supervision, and civil conspiracy claims. Finally, Hunter argues that the district court erred in concluding that Hunter failed to establish any damages for the alleged breaches of its noncompete provision.

II.

"On appeal from a bench trial, we may only set aside findings of fact if they are clearly erroneous, and we must give due regard to the opportunity of the district court to judge the credibility of the witnesses." *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir. 1998). A district court's factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted). "[W]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Id.* (internal quotation marks omitted and alteration in original). We review the district court's legal conclusions de novo. *See Williams v. Sandman*, 187 F.3d 379, 381 (4th Cir. 1999).

We have reviewed the record, briefs, and pertinent case law on this matter, and we have had the benefit of oral argument. Our careful review persuades us that the rulings of the district court were correct. *See Hunter Group, Inc. v. Smith*, No. AMD 97-1871 (D. Md. Mar. 17, 2000). Accordingly, we affirm the judgment in favor of the employees and Deloitte on the reasoning of the district court.

*AFFIRMED*